UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 6 2015
```

Stephen W. Silberstein,

                    Plaintiff,

        –v–

Aetna, Inc., *et al.*,

                    Defendants.

13-cv-8759 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This is an action for filing false or misleading proxy statements in violation of 15 U.S.C. § 78n(a) and its implementing regulation, 17 C.F.R. § 240.14a-9. Plaintiff Stephen W. Silberstein alleges that Defendant Aetna, Inc., and several of its corporate directors, filed proxy statements with material misrepresentations and omissions in their descriptions of the company's political contribution disclosure practices in response to proposed shareholder resolutions in 2012 and 2013. Plaintiff seeks to have the Court declare void the votes on the 2012 and 2013 shareholder resolutions at issue, to enjoin Defendants to resubmit the proposals at the next shareholder meeting, and to require Defendants to inform shareholders about certain aspects of their disclosure practices and any judgment in Plaintiff's favor in this action. Defendants have moved to dismiss the Amended Complaint. *See* Dkt. No. 43. For the following reasons, that motion is GRANTED.

## I.    Background

For the purpose of evaluating Defendants' motion to dismiss, all allegations in Plaintiff's complaint are taken as true.

### A.  The Parties and the 2007 Disclosure Agreement

1

Defendant Aetna, Inc. is one of the nation's largest health care and insurance providers. The individual Defendants named in this suit were the members of Aetna's Board of Directors when the company's 2012 and 2013 Proxy Statements were distributed. Am. Compl. ¶¶ 7-8. Plaintiff has been an Aetna shareholder since 2003. Am. Compl. ¶ 5.

Though Plaintiff's complaint alleges that Defendants distributed false proxy statements in 2012 and 2013, the story begins in 2007. That year, in order to secure the withdrawal of a proposed shareholder resolution requesting disclosure of its use of corporate funds for political expenditures, the company agreed to adopt a political spending policy. Am. Compl. ¶¶ 9-10. In a letter of agreement accompanying the withdrawal of that resolution, Aetna agreed to produce an annual Political Contributions Report, which would detail 1) the amount of corporate funds the company expended annually on federal lobbying and for "political purposes"; 2) the portion of all coalition and trade association payments allocated for "lobbying, political and other non-deductible purposes"; and 3) the "identity of the top trade associations receiving Aetna corporate funds ($50,000 plus) and the portion of … payments allocated by such [entities] to lobbying, political or other non-deductible activities." Am. Compl. ¶ 10.

The sponsor of that resolution, Mercy Investment Services, apparently began to question whether Aetna was abiding by its agreement. In 2012, Mercy sent a letter to Defendant Mark T. Bertolini (Aetna's chairman and chief executive officer) inquiring how the company's 2009 contribution to an industry group adhered to the negotiated policy. Am. Compl. ¶ 11. Mercy was concerned over contributions to an industry group which later transferred over $85 million to the U.S. Chamber of Commerce to oppose passage of the Affordable Care Act, which was then pending. Am. Compl. ¶ 11.

**B. The 2012 SEIU Resolution**

The first shareholder resolution at issue in this case was presented by the Service Employees International Union Master Trust (hereinafter "SEIU") for consideration at Aetna's 2012 annual shareholder meeting. The 2012 SEIU resolution requested Aetna to prepare a report, to be updated annually, disclosing the company's policies and procedures for making

indirect political contributions and expenditures, including the Board's role in the process. Am. Compl. ¶ 12; Dkt. No. 45-3 at 82 (2012 Proxy Statement). The resolution further requested that the company disclose in the report indirect monetary and non-monetary political contributions or expenditures made by way of contributions to tax-exempt social welfare organizations, and the portion of any dues or payments to trade associations used for an expenditure or contribution that would not have been tax-deductible had it been made directly by the company. Am. Compl. ¶ 12; Dkt. No. 45-3 at 82. The identities of all recipients of company funds from these organizations and the amount they received was also to be identified in the report. Am. Compl. ¶ 12; Dkt. No. 45-3 at 82.

The Board opposed the resolution. In the 2012 Proxy Statement soliciting votes in opposition to the resolution, the Board stated that it "agree[d] that transparency and accountability with respect to political expenditures are important," and notified shareholders that Aetna publishes an annual Political Contribution and Related Activity Report at www.aetna.com. Am. Compl. ¶ 13; Dkt. No. 45-3 at 83. The statement further represented that Aetna complies with all state and federal disclosure laws regarding political and lobbying activity, and that "the Company's Audit Committee reviews the Company's Political Contributions Report prior to publication." Am. Compl. ¶ 14; Dkt. No. 45-3 at 83. It continued, "[M]anagement regularly discusses public policy issues and political activities with our full Board. … [O]ur Board will continue to exercise oversight with respect to public policy matters." Am. Compl. ¶ 14; Dkt. No. 45-3 at 83. The statement concluded, "We believe that the information currently available to shareholders is easily accessible and understandable and, coupled with the oversight of the Company's political activities by the Board, is in the best interest of the Company." Am. Compl. ¶ 15; Dkt. No. 45-3 at 83.

The company's website provided the following information under the heading "Aetna Legislative and Regulatory Activities":

> Aetna is committed to supporting the development of sound public policy in health care. We work with many organizations across the political spectrum on a variety

3

of health and other topics that impact our members, our customers, our providers, our industry, our employees, and the communities we serve.

Am. Compl. ¶ 18.  The second paragraph continued:

> We are a member of trade associations and coalitions that advocate for our industry and free enterprise, and we support policy development organizations and think tanks.  Support for third-party organizations is guided by our Involvement Criteria.  A list of the 501(c)(6) trade associations to which we contribute more than $50,000 annually can be found in our Political Contributions and Related Activity Report.

Am. Compl. ¶ 18.  The website separately listed the "Involvement Criteria" discussed in this

excerpt, which were:

> The group's involvement and degree of relevance to Aetna's business and public policy priorities
> The group's general perspective and support of free enterprise and understanding of market-based principles in guiding approach to health care systems
> The experience and/or potential of the group to execute its activities in a sound and professional manner.

Am. Compl. ¶ 19.  As for the Board of Director's role in reviewing political contributions, the

website explained:

> Our Board of Directors annually reviews the company's list of Government Affairs Priorities, its Contributions Criteria, and its Involvement Criteria.  The Board reviews the company's Political Contribution and Related Activity Report prior to its publication and oversees compliance with policy and process.  Further, our Board reviews the independent audit reports of Aetna Inc. and the Aetna Political Action Committees.

Am. Compl. ¶ 20.

The resolution was defeated at the company's annual meeting by a vote of 25,857,979 shares

in favor to 232,213,535 shares against.  Dkt. No. 45-4 at 3.

### C. The 2013 Unitarian Resolution

The following year, the Unitarian Universalist Association of Congregations presented

another shareholder proposal regarding political contributions for consideration at Aetna's 2013

annual meeting (the "Unitarian resolution").  That proposal requested the Board to amend

Aetna's Political Contributions Policy to include enhanced oversight provisions for the

company's political expenditures.  Specifically, it requested that the Board be assigned

4

responsibility for "formulating and revising the Policy" and "establishing the parameters of Aetna's commitment to publicly disclose political expenditures (in addition to legal disclosure requirements)." Am. Compl. ¶ 22; Dkt. No. 45-5 at 77 (2013 Proxy Statement). It also included a provision requiring the Audit Committee to report to the full Board annually on compliance with the Contributions Policy and the "risks associated with Aetna's political activities," including those undertaken through politically active trade associations and social-welfare organizations. Am. Compl. ¶ 22; Dkt. No. 45-5 at 77. Finally, the resolution requested that the Board "[e]stablish specific criteria tailored to analyzing whether to make payments to Intermediaries for political purposes, requiring articulation of the business rationale for each payment and consideration of the use(s) to which the funds will be put by the Intermediary." Compl. ¶ 22; Dkt. No. 45-5 at 77.

Like the 2012 SEIU proposal, the Board opposed the Unitarians' 2013 resolution and solicited proxy votes against it. In its response, it stated that "the Company recently expanded the information available on its website about its policies and procedures regarding political contributions and the related oversight of those activities. This information can be found at http://www.aetna.com/about-aetna-insurance/initiatives/political-action-committee.html." Am. Compl. ¶ 23; Dkt. No. 45-5 at 77. It also referred shareholders to the Political Contributions and Related Activities Report, alerting them that it is published annually and indicating that the 2011 and prior reports were available at http://www.aetna.com/about-aetna-insurance/document-library/pac/2011/2011-Aetna-PAC-annual-report.pdf. Am. Compl. ¶ 23; Dkt. No. 45-5 at 77-78. The statement noted that the company complies fully with federal and state disclosure laws, and that "[t]he 2012 Center of [sic] Political Accountability CPA-Zicklin Index of Corporate Political Accountability and Disclosure ... ranked Aetna 15th among the top 200 companies in the S&P 500 Index ... ." Dkt. No. 45-5 at 78. The Board indicated that it already oversaw Aetna's political expenditures, and had a "robust" oversight role over the company's contribution policies. Dkt. No. 45-5 at 78.

According to Plaintiff, the 2011 Political Contributions Report referred to in the 2013 proxy statement contains multiple inaccuracies. For example, the Report lists contributions of $10,000 each to the Republican Governors Association and Democratic Governors Association, but the groups' tax forms for 2011 indicate that the former received $350,000 from Aetna, and the latter received $350,250 from an Aetna subsidiary. Am. Compl. ¶¶ 25-26. Plaintiff states that this was not the first time Aetna had misrepresented its contributions in the disclosure report; its 2009 report indicated no contributions to either Governors Association when tax records indicated they both received at least $100,000, and in each of the three years before that the company either erroneously represented that it had made no contributions to the groups, or significantly underreported its contributions. Am. Compl. ¶ 27. In addition to the Governors Associations contributions, Plaintiff alleges that at least $17,500 in contributions to nine organizations did not appear on the 2010 Political Activities Report, and $12,020 in contributions to four organizations did not appear on the 2011 Report. Am. Compl. ¶ 28-29. Plaintiff also alleges inaccuracies in the 2012 Political Contributions Report, although that report was not referenced in either of the proxy statements at issue. Am. Compl. ¶ 28.

In particular, Plaintiff focuses on a $3,317,925 contribution that Aetna made to the American Action Network, a tax-exempt organization under Internal Revenue Code § 501(c)(4). That contribution was not disclosed in the 2011 Political Contributions Report. Plaintiff alleges that the contribution should have been disclosed, because the American Action Network exists to sway elections, and it spent its money to support or oppose congressional campaigns and to launch an ad campaign aimed at repealing the Affordable Care Act. Am. Compl. ¶ 34. The contribution was brought to shareholders' attention because Aetna inadvertently disclosed it in a filing with the National Association of Insurance Commissioners (NAIC), and the Universalists discussed it in their 2013 proposed shareholder resolution. Am. Compl. ¶ 30. The company's filings with the NAIC also made an inadvertent disclosure of $4,479,200 in contributions to the U.S. Chamber of Commerce in 2011, which was later disclosed as a $4,000,000 contribution in a footnote to the 2011 Political Contributions Report. Am. Compl. ¶¶ 31-32. Aetna amended its

6

NAIC filings to remove references to the American Action Network and Chamber of Commerce contributions when "confronted" with its disclosures. Am. Compl. ¶ 35. As a result of its mistaken disclosure of the American Action Network and Chamber of Commerce contributions, Aetna dropped from 15th to 52nd on the Zicklin Index. Am. Compl. ¶ 40.

In addition to the alleged late reporting and under-reporting of the contribution to the Chamber of Commerce, Plaintiff claims that the contribution was falsely labeled a "voter education initiative." Am. Compl. ¶ 32. Plaintiff states a "voter education initiative" is generally understood as an effort to "increase voter registration and voting," while contribution to the Chamber of Commerce was used (at least in part) to air negative advertisements targeted at certain candidates for Congress. Am. Compl. ¶ 33.

Shareholders voted down the Unitarians' proposal at the 2013 annual meeting by a vote of 16,563,319 in favor to 230,340,504 against. Dkt. No. 45-6 at 4.

### D.  Procedural History

Plaintiff filed this action on December 10, 2013, Dkt. No. 1, and filed the Amended Complaint on March 3, 2014, Dkt. No. 27. On March 6, 2014, Plaintiff moved for a preliminary injunction, which the Court denied on April 9, 2014 after hearing oral argument, because Plaintiff failed to demonstrate that he was likely to suffer irreparable harm in the absence of preliminary relief. Dkt. No. 38. Defendants filed the instant motion to dismiss shortly thereafter. Dkt. No. 43.

### II.    Motion to Dismiss Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must accept all well-pleaded facts as true and draw all reasonable inferences in the light most favorable to the plaintiff. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). While this creates a presumption that the plaintiff's allegations are true, a court is not bound by "a legal conclusion couched as a factual

7

allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When evaluating whether a complaint has stated a claim on which relief can be granted, a court

may consider "documents attached to the complaint as an exhibit or incorporated in it by

reference, matters of which judicial notice may be taken, or documents either in plaintiffs'

possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v.*

*Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks and alterations omitted)

(quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

### III.   Discussion

The Amended Complaint alleges violations of 15 U.S.C. § 78n(a)(1) and the Securities

and Exchange Commission's (SEC) implementing regulation, 17 C.F.R. § 240.14a-9 ("Rule 14a-

9"). Section 78n(a)(1) makes it unlawful for any person to solicit a proxy in contravention of the

SEC's rules. Under Rule 14a-9,

> No solicitation subject to this regulation shall be made by means of any proxy
> statement, … containing any statement which, at the time and in the light of the
> circumstances under which it is made, is false or misleading with respect to any
> material fact, or which omits to state any material fact necessary in order to make
> the statements therein not false or misleading or necessary to correct any statement
> in any earlier communication with respect to the solicitation of a proxy for the same
> meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). Defendants move to dismiss the Amended Complaint on four

grounds. First, Defendants contend that Rule 14a-9 cannot be applied to alleged

misrepresentations in the Political Activities Reports, because they are not part of the proxy

statements themselves. Second, Defendants argue that any claims based on the 2012 Proxy

Statement are time-barred. Third, Defendants maintain that the Amended Complaint does not

contain any allegations that a material misstatement or omission was made in either the 2012 or

2013 Proxy Statement. And fourth, Defendants assert that Plaintiff is not entitled to equitable

relief even if he has otherwise stated claims for relief, and the Amended Complaint must be

dismissed because this is the only type of relief Plaintiff seeks.

### A.  Incorporation by Reference

Defendants claim that any misrepresentations or omissions in the 2010 and 2011 Political Contributions Reports cannot be considered in an action for false proxy statements under Rule 14a-9 because those documents were not incorporated by reference into the 2012 and 2013 Proxy Statements, respectively. Incorporation by reference is a term of art in the SEC's rules. Under note D to 17 C.F.R. § 240.14a-101, a document is incorporated by reference into a proxy statement only when the company "include[s] a statement on the last page(s) of the proxy statement as to which documents, or portions of documents, are incorporated by reference." In context, however, it is clear that this provision was adopted for the benefit of shareholders. The next sentence of note D provides that "[i]nformation shall not be incorporated by reference in any case where such incorporation would render the statement incomplete, unclear or confusing," and other provisions are included to ensure shareholder access to documents incorporated by reference but not filed with the proxy statement. *Id.* Other portions of section 240.14a-101 explain that specific required disclosures will not be deemed incorporated by reference unless they are expressly listed as incorporated. *Id.* The "incorporation by reference" rule is concerned with when material extraneous to the proxy statement itself can be "charged to the knowledge of the stockholder." *Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003). It is thus a poor fit for this case, where the report is not being used defensively as a means of fulfilling Aetna's disclosure requirements.

Plaintiff forswears reliance on the incorporation-by-reference provisions of the SEC's rules, and instead suggests that the Contributions Reports may be considered because they "form the central basis for the Company's argument against adopting the 2012 and 2013 shareholder proposals." Pl. Mem. in Opp. at 18 (Dkt. No. 46). However, Plaintiff cites no authority to indicate that there is *any* mechanism by which documents become part of a proxy statement, or subject to liability under Rule 14a-9, simply because they are mentioned in that statement. Whatever the original intent of the incorporation by reference provisions, the fact that it is a Rule 14a-9 plaintiff rather than a defendant who is arguing for effective incorporation of the document

9

does not logically lead to an expansion of the materials that are considered part of a proxy statement.

Accordingly, even though certain allegations in the Amended Complaint can be understood to suggest that inaccuracies in the Contributions Reports are sufficient on their own to state a claim, the Court understands Plaintiff to be making a different legal argument: that the existence of misrepresentations or material omissions in the Report in turn demonstrates misrepresentations or material omissions in the proxy statements. *See* Pl. Mem. in Opp. at 20. If inaccuracies in the Political Contributions Reports render Defendants' description of its disclosure practices—and any representation that the Reports are an accurate embodiment of its disclosure practices—materially misleading, then a court may rightly consider allegations that rely on the Reports. The Court will therefore consider the allegations regarding the Political Contributions Reports in this light.

## B.  Statute of Limitations

Defendants next argue that Count I of the Amended Complaint, which details the allegations stemming from the 2012 Proxy Statement, is barred by the applicable statute of limitations. Defendant bears the burden of presenting *prima facie* proof on the affirmative defense that the statute of limitations has run. *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995).

Claims under Rule 14a-9 must be brought within one year of discovery and no more than three years after accrual. *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 353, 364 (2d Cir. 1990).[1] The one-year period from discovery of the violation begins to run when the plaintiff

---

[1] The *Ceres* court borrowed the one-year/three-year limitations period for the implied right of action under Rule 14 from the express rights of action and limitations periods under sections 9(f) (formerly 9(e)) and 18(a) of the Securities and Exchange Act of 1934, as amended (codified at 15 U.S.C. §§ 78a *et seq.*). *See* 918 F.2d at 364. Some plaintiffs have challenged the continued vitality of the one-year/three-year period based on this analogy because § 9(f) has since been amended to create a two-year/five-year period for actions involving fraud or deceit by the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. *See, e.g., Dekalb Cnty. Pension Fund v. Transocean Ltd.*, No. 10-cv-7498 (LGS), 2014 WL 941699, at *3 (S.D.N.Y. Mar. 11, 2014). Plaintiff has not

"obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *LC Capital Partners v. Frontier Ins. Grp.*, 318 F.3d 148, 154 (2d Cir. 2003) (construing similar statute of limitations in § 10(b) of SEC Act of 1934) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)) (quotation marks and emphasis omitted). An investor is deemed to be on inquiry notice of the facts leading to a cause of action when "the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993); *Bond Opportunity Fund v. Unilab Corp.*, No. 99-cv-11074 (JSM), 2003 WL 21058251, at *12 (S.D.N.Y. May 9, 2003) (applying inquiry notice standard to § 14(a) actions). Inquiry notice is not to be found lightly, particularly at the motion to dismiss stage. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 209 (S.D.N.Y. 2004); *Newman v. Warnaco Grp.*, 335 F.3d 187, 194-95 (2d Cir. 2003); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993). The information available to plaintiffs must show that a material misstatement or omission in the proxy statement was probable, not merely possible. *See Newman*, 335 F.3d at 194. Even though the question of whether a plaintiff had sufficient knowledge of the facts to be placed on inquiry notice often cannot be resolved in a motion to dismiss, it can properly be adjudicated if "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers … integral to the complaint … ." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (quoting *LC Capital Partners*, 318 F.3d at 156) (first alteration in original).

---

advanced this argument, so the Court does not consider it. However, most courts confronted with the argument have rejected it and maintained the one-year/three-year limitations period, even in Rule 14 cases containing allegations of fraud or deceit. *See id. and sources cited therein.*

Defendants suggest two dates from which the one-year, discovery-based statute of limitations began to run for actions based on the 2012 Proxy Statement.  The earlier is the date the proxy statement was filed, April 9, 2012.  Alternatively, Defendants argue that the quantity of information in the public domain by June 2012—including a CNNMoney report[2] on the inadvertent disclosure of Aetna's contribution to the American Action Network, and a press release by Plaintiff's counsel entitled "Aetna Hides $7 Million in Political Spending"—demonstrates that an ordinary investor would probably realize she had been defrauded.  Recognizing either of Defendant's proposals as the date of discovery would mean the 2012 allegations are time-barred, because Plaintiff filed the original complaint in this action on December 10, 2013.  *See* Dkt. No. 1.

Plaintiff responds that no reasonable shareholder could have been on inquiry notice when the 2012 Proxy Statement was filed, and that it was Plaintiff's counsel's efforts to uncover the omissions and misstatements in the Political Contributions Reports that made the relevant information available to ordinary shareholders.  As for the June 2012 date when public information began to appear about Aetna's missing disclosures, Plaintiff argues that the information was not "readily accessible" to shareholders, and that the "magnitude of problems" was not apparent until Plaintiff's counsel conducted extensive research.  Pl. Mem. in Opp. at 23.  According to Plaintiff, it would only be through "research and knowledge about the existence of these public records [disclosing campaign contributions and expenditures], how to find them, how to retrieve information from them, and how to analyze that information" that shareholders

---

[2] Charles Riley, *Oops! Aetna discloses political donations*, CNNMoney (June 15, 2012, 6:37 PM), http://money.cnn.com/2012/06/14/news/economy/aetna-political-contributions/ (last visited Mar. 25, 2015) (discussing, *inter alia*, the 2012 SEIU proposal).

could have discovered the breadth of the misstatements and omissions in Contributions Reports and proxy statement, and that no reasonable shareholder could be expected to do so. *Id.*

The Court agrees with Plaintiff that the allegations in the Amended Complaint and the documents integral to it do not establish that shareholders were on inquiry notice about the misstatements and omissions at the time the 2012 Proxy Statement was filed in April 2012. Defendants argue that all of the documents that would eventually underlie Count I, including the 2010 Political Contributions Report and state and federal disclosure forms, were publicly available by January 2012. But there is no reason why the discrepancy between the disclosure forms and the Contributions Report would have "come to the attention" of the ordinary shareholder. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 431 (2d Cir. 2008) (explaining that an article in a trade newspaper implicating the defendant by name did not necessarily place a reasonable investor of ordinary intelligence on notice of the probability of fraud). It is only information that specifically indicates to ordinary shareholders that the type of wrongdoing alleged is probably occurring that can place an ordinary investor on inquiry notice. *Cf. LC Capital Partners*, 318 F.3d at 155 (plaintiffs on inquiry notice that defendants were probably committing stock fraud by deliberately under-reserving for insurance claims and conducting a pyramid scheme because defendant repeatedly made large reserve charges in a short time frame, which "should alert any reasonable investor that something is seriously wrong"). Filing disclosure forms is not suspicious behavior in and of itself, and nothing on the face of the forms would have indicated Aetna's alleged wrongdoing. The forms are required, and not of the type a reasonable investor would necessarily cross-check against a company's other pronouncements. The fact that a shareholder with infinite time and an inclination to undertake fishing expeditions might have discovered the violation does not put any reasonable shareholder

13

on notice.  At any rate, these public filings were going out at the same time Defendants were

assuring shareholders in the proxy statement that a robust disclosure plan was in place, which

detracts from the possibility shareholders were on inquiry notice despite the existence of

"ominous indicators."

However, the landscape changed by June 2012.  Both the national media (in the

CNNMoney report) and the organization serving as Plaintiff's counsel in this action had made

public pronouncements about Aetna's allegedly faulty disclosure practices is a strong indication

that the ordinary investor of average intelligence would have been aware that the 2012 and 2013

Proxy Statements contained misstatements and omissions.  That Plaintiff's counsel was able to

file a press release regarding Aetna's disclosure practices is a strong indication that the inquiry

period began sometime on (or more likely before) the June 14, 2014 date of its publication.

Indeed, the release itself contains a link to a letter to Defendant Bertolini containing allegations

that statements in the 2012 Proxy Statement were untrue.  *See* Letter from Melanie Sloan,

Executive Director, Citizens for Responsibility and Ethics in Washington, to Mark T. Bertolini,

Chairman, CEO and President, Aetna, Inc. (June 14, 2012), *available at*

http://www.citizensforethics.org/page/-/PDFs/Legal/Letters/6-14-

12_CREW_Letter_to_Aetna.pdf?nocdn=1 (last visited Mar. 25, 2015).[3]

Even if Plaintiff's counsel had been conducting investigations that no reasonable

shareholder would have undertaken up to the point of that publication, the news reports and press

---

[3] The Second Circuit has held that when deciding whether a plaintiff was on inquiry notice, it is proper to
take judicial notice of the fact that certain information was subject to press coverage, as opposed to taking judicial
notice of the contents to establish their truth. *Staehr*, 547 F.3d at 425.  Accordingly, the Court takes judicial notice
of the existence of the press release and related letter, which are available on Plaintiff's counsel's website.  The
Court also takes judicial notice of the fact of the CNNMoney article discussing the American Action Network
contribution. *See supra* n.2.

releases calling out Aetna for the exact type of misstatements that are alleged in this case—
indeed, for some of the same allegations raised in the Amended Complaint—demonstrate that
ordinary shareholders were on "notice of the facts, which in the exercise of reasonable diligence,
would have led to actual knowledge" by that time. *LC Capital Partners*, 318 F.3d at 154.  That
the "magnitude" of the misstatements was not fully disclosed does not undermine this
conclusion, because "[a]n investor does not have to have notice of the entire fraud being
perpetrated to be on inquiry notice." *Staehr*, 547 F.3d at 427 (quoting *Dodds*, 12 F.3d at 352)
(quotation marks omitted).

It is true that, in the context of deciding whether a proxy statement is materially false,
"sporadic news reports" have not been considered enough to counteract misleading statements in
the proxy statement. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d
109, 127 (2d Cir. 2013).  In determining when a duty of inquiry arose to investigate facts
underlying a potential cause of action, however, courts have been much more likely to rely on
press coverage, particularly coverage that specifically names the defendant. *See Staehr*, 547
F.3d at 427-31.  The extent of press coverage matters, as that can give a clue as to whether the
information would "come to the attention of a reasonable investor of ordinary intelligence." *Id.*
at 431.  However, on the facts of this case they only reasonable inference available is that
reasonable shareholders of ordinary intelligence were on sufficient notice to trigger a duty of
inquiry by June 2012 or shortly thereafter, because Plaintiff's counsel had already discovered at
least part of the significant gap it alleges between Aetna's disclosure practices as described in the
2012 Proxy Statement, and the company's actual nondisclosure of the American Action Network
and U.S. Chamber of Commerce contributions.

When applying the discovery rule, the Second Circuit has treated differently investors who neglect the duty to begin an investigation, and those that begin an inquiry once the duty arises. The former category has been charged with knowledge from the date inquiry notice arises, where the latter (diligent) category of plaintiffs has been imputed with knowledge of what should have been discovered in the exercise of reasonable diligence, thus delaying the start of the one-year period until the time the inquiry "should have revealed" the fraud. *LC Capital Partners*, 318 F.3d at 154. The Supreme Court held in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), that under the statute of limitations governing § 10(b) of the SEC Act of 1934, that statute's two-year period cannot begin to run until the plaintiff would have discovered the facts demonstrating the fraud, regardless of whether the plaintiff initiates an inquiry as soon as notice arises. *Id.* at 653. *Merck* has not explicitly been applied to actions under § 14(a), and there is some uncertainty as to *Merck*'s effect on statutes of limitations other than 28 U.S.C. § 1658(b). *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 133 (S.D.N.Y. 2014). However, the Court need not consider whether *Merck* applies to § 14(a), because it is clear from Plaintiff's allegations that an investigation began when inquiry notice arose.

Thus, Count I is time-barred unless an investor acting with reasonable diligence would not have discovered the facts giving rise to this claim until December 10, 2012—nearly six months after Plaintiff's counsel issued a press release detailing one of the major factual allegations underlying the Amended Complaint. Even granting some leeway for the time it would take to discover other facts underlying the allegations, such as the discrepancy between the reported and actual amounts of contributions to the Republican Governors Association and Democratic Governors Association, the fact remains that all of these documents were publicly available for an investigation at the time, and Plaintiff and other investors knew no later than

June 2012 that there were material omissions in the Political Contributions Report. Though they may not have had perfect knowledge of all misstatements and omissions, ordinary shareholders were on notice of the facts that would give rise to the violation of Rule 14a by that time, or should have been shortly thereafter through the exercise of reasonable diligence. Based on the allegations in the Amended Complaint and matters of which the Court may take judicial notice, a reasonable investor of ordinary intelligence would have discovered the facts giving rise to Count I, through the exercise of reasonable diligence, before December 10, 2012. Count I must therefore be dismissed as time-barred.

### IV.     Material Misrepresentations or Omissions

Count II of the Amended Complaint, regarding the Universalists' proposal for consideration at the 2013 meeting, alleges that Defendants made a series of false and misleading statements in opposition to the proposal in the 2013 Proxy Statement. Plaintiff contends that the proxy statement's representations that Aetna releases "extensive information about its political contributions," that the Board has a "robust" oversight role over contributions, and that the company's disclosures include "additional information beyond that required by current laws and regulations," misrepresent the company's actual disclosure practices. Relying on the 2011 Political Contributions Report and earlier reports as proof of these "extensive" disclosure practices was similarly misleading, alleges Plaintiff, because the Report failed to disclose the $7 million-plus in contributions to the American Action Network and U.S. Chamber of Commerce in 2011, and accordingly did not live up to the terms of Defendants' 2007 agreement with Mercy Investment Services. Indeed, says Plaintiff, any representation that the company was disclosing its contributions through its website and Political Contributions Reports was misleading because the Reports did not contain accurate disclosures. Plaintiff also faults Defendants for

characterizing the American Action Network and Chamber of Commerce contributions as being for "voter education" purposes, which they claim was misleading because the money was used for political advertisements.

Plaintiffs further allege that Defendants' reliance on the Zicklin Index to demonstrate the transparency of its disclosure practices was misleading, because the Index measured only disclosure practices as they were explained by the company, and the company's failure to account for its major nondisclosures made the rating inaccurate. This inaccuracy would be reflected the following year, says Plaintiff, when the company's Zicklin rating fell from 15th to 52nd, and the failure to disclose the $7 million in contributions was specifically mentioned in a footnote.

Finally, Plaintiff alleges that shareholders were misled by the statement that "the Company's Audit Committee reviews the Company's Political Contributions Report prior to publication." This is because, given the alleged inaccuracies in the Report, one of two mutually exclusive but collectively exhaustive scenarios must have played out, according to Plaintiff. Either reviewing the Report gave the Directors actual knowledge of its inaccuracies and the statement was intended to give investors a false sense of security about the accuracy of Aetna's disclosure practices, or the Directors were not aware of the inaccuracies in the Report and the statement that the Audit Committee had reviewed it was therefore false in any realistic sense.

To state a claim under Rule 14(a), a plaintiff must plead plausible allegations "1) that the proxy materials contain a false or misleading statement of a material fact, or omit to state a material fact in order to make the statement not false or misleading; 2) that the misstatement or omission of a material fact was the result of knowing, reckless, or negligent conduct; and 3) that the proxy statement was an essential link in effecting the proposed corporate action." *United*

*Paperworkers In'l Union v. Int'l Paper Co.*, 801 F. Supp. 1134, 1139-40 (S.D.N.Y. 1992) (citing *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1298-1301 (2d Cir. 1973)), *aff'd as modified* 985 F.2d 1190 (2d Cir. 1993). The standard for finding a statement or omission to be false or misleading is not a backbreaking one that faults every imperfection in the proxy statement. "[N]ot every corporate counsel is a Benjamin Cardozo . . . and nit-picking should not become the name of the game." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978) (internal quotation marks and citations omitted) (alterations in original). Instead, the proxy statement need only be sufficiently accurate that shareholders are not misled. *Bond Opportunity Fund v. Unilab Corp.*, No. 99-cv-11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003).

Beyond being false or misleading, a statement or omission must be material to state a Rule 14a claim. A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). When a plaintiff alleges a material omission, there "must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. At the motion to dismiss stage, a claim will not be dismissed on the ground that a misstatement or omission is immaterial "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985)) (quotation marks omitted).

Though Plaintiff appears to suggest that a claim may be stated when the "total mix" of information available to shareholders is misleading, *see* Pl. Mem. in Opp. at 16 (describing discrepancies in the Report as part of the "total mix" of information), the correct inquiry is whether the *proxy statement* is misleading in light of the total mix of information.  Supreme Court and Second Circuit cases are clear that the "total mix" is analyzed to determine whether, looking beyond the face of the proxy statement, a reasonable shareholder would have enough information that any omission from the proxy statement would not be misleading. *See, e.g.*, *TSC Indus.*, 426 U.S. at 449 (explaining that plaintiff must show that *disclosure of omitted fact* would substantially alter "total mix" of information); *United Paperworkers*, 985 F.2d at 1198 ("In considering a claim of material omission in violation of Rule 14a-9, however, the court ordinarily should not consider the proxy statement alone.").  "While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil." *Va. Bankshares*, 501 U.S. at 1097.  To fail on materiality grounds at the motion to dismiss claim, it must be clear that, even when the allegations in the complaint are taken as true and all reasonable inferences are drawn in the plaintiff's favor, "the inconsistency would exhaust the misleading conclusion's capacity to influence the reasonable shareholder." *Id.* at 1097-98.

Even taking Plaintiff's factual allegations as true and applying the materiality standard that governs at the motion to dismiss stage, the vast majority of Plaintiff's allegations are facially insufficient to state a claim because there is no plausible showing that the misstatements or omissions were material.  Plaintiff's case is largely built around the omission of the roughly $7 million in contribution to American Action Network and the Chamber of Commerce from the 2011 Political Contributions Report.  However, the fact that these contributions were made was

disclosed on the face of the 2013 Proxy Statement, in the statement supporting the Unitarians'

Proposal, immediately before the Company's Response.

> Strong board oversight is particularly important at Aetna, which disclosed that it
> gave $4,000,000 to the US Chamber of Commerce for unspecified "voter education
> initiatives" and $3,000,000 to the American Action Network, a social welfare
> organization that sponsors ads regarding political candidates, in 2011. The "voter
> education" initiatives described on the Chamber's website consisted of attack ads
> aimed at specific candidates.

Dkt. No. 45-4 at 77. The company's statement in opposition to the proposal neither disputes that

these contributions were made, nor attempts to counteract the characterization of "voter

education" initiatives. Accordingly, the Proxy Statement made shareholders aware of Aetna's

contributions to the American Action Network and Chamber of Commerce, and by extension of

the fact that the 2011 Political Contributions Report did not disclose these contributions. No

reasonable shareholder of ordinary intelligence would be misled into thinking that Aetna's

disclosure practices included disclosing contributions like the ones to American Action Network

and the Chamber of Commerce, or that "voter education initiatives" did not potentially mean

political advertisements. No necessary information that would have made this clear, or

significantly altered the total mix of information available to shareholders, was omitted.

Shareholders substantially had the information that Plaintiff claims Defendants should have

disclosed, and voted against the proposal while being aware of that information.[4]

Besides allegations that Aetna failed to disclose the American Action Network and

Chamber of Commerce contributions, Plaintiff has raised allegations that the certain aspects of

---

[4] Furthermore, even if Plaintiff is correct that the disclosures were required as part of the 2007 agreement
with Mercy Investment Services (which Defendants dispute), Defendants made no representation regarding the
nature of that agreement in the Proxy Statement. This is not an action to enforce the 2007 agreement; there must be
a misstatement or omission in the 2013 Proxy Statement to state a claim. At most, Plaintiff might suggest that
Defendants omitted reference to the 2007 agreement in the Proxy Statement, but the agreement was made publicly
by the company and a reasonable shareholder of ordinary intelligence would already be aware of it. Therefore, the
Complaint does not plausibly allege that the omission of any direct mention of the agreement was materially
misleading in the context of the Proxy Statement.

the 2013 Proxy Statement were rendered misleading or untrue because of other inaccuracies in the 2011 Political Contributions Report; that statements regarding the Audit Committee's review and Board's oversight of the company's political expenditures were untrue or misleading without further information; and that Defendants' characterization of its disclosure practices as extensive, robust, and exceeding what is required by law were material misstatements, or were misleading without further omitted material.  For the reasons discussed above, *see supra* at 9, the allegedly inaccurate figures in the Contributions Reports are not actionable on their own, but rather only insofar as they make the proxy statement misleading because of material misstatements or omissions.  All of these matters, then, come to a similar argument that the Defendants casted their disclosure practices in a misleading light by omitting material information at odds with their own characterization of those practices, or by making active misrepresentations of their practices.

In large part, these allegations portray Defendants' statements of opinion that the disclosure practices are "extensive" and "robust" as misleading.  Statements of reasons, opinions, or belief are actionable under Rule 14(a), so long as they were made with knowledge that the directors did not hold the beliefs or opinions expressed, are actually false or misleading, and are made about material facts. *See Va. Bankshares*, 501 U.S. at 1090-91.  As with any other statements that are allegedly rendered misleading because of material omissions, whether such statements are materially misleading is not evaluated from the proxy statements alone, but in light of the "total mix" of information available to shareholders, which may take the sting out of the otherwise misleading statements. *TSC Indus.*, 426 U.S. at 449.  However, statements that amount to mere "puffery" do not violate Rule 14a. *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Statements may be

considered nothing more than puffery when they are too general for a shareholder to reasonably rely on them when deciding how to vote, or if a reasonable investor would not believe that the words carried the meaning that a plaintiff tries to read into them. *See id.*; *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996). For example, in *Local 134*, the plaintiffs faulted JP Morgan Chase for statements that it had a "highly disciplined" risk management process that "set the standard for integrity." *Local 134*, 553 F.3d at 205-06.

Both parties compare this case to *United Paperworkers International Union v. International Paper Co.*, 985 F.2d 1190 (2d Cir. 1993). There, the Second Circuit held that the defendant violated Rule 14(a) in a proxy statement opposing a shareholder resolution requesting the company to adopt stricter environmental standards. *Id.* at 1193. The proxy statement told shareholders that the company had addressed environmental matters "in an appropriate and timely manner," and was on the "forefront" of environmental protection; that implementation of the proposal "would not provide any greater environmental protection than now exists"; and, in a statement of principles appended to the proxy statement, explained that the company was dedicated to producing environmentally sound products and that "environmental stewardship" was an important part of its business. *Id.* at 1193-94. However, while the company disclosed in its annual report that it had pleaded guilty to give criminal charges for environmental violations in Maine, it neglected to reveal that they were felonies; that these violations involved falsification of reports; and that it paid the second-largest fine ever for a violation of hazardous-waste laws. *Id.* at 1195. It also failed to mention that more fines were expected, that the company had recently settled a civil environmental suit, that the company was involved in approximately 50 proceedings under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and comparable state laws, and that the EPA had

initiated proceedings to bar the company from doing business with the federal government for three years. *Id.* at 1196. In light of this reality, the court found that statements such as having a "longstanding commitment" to protecting the environment and being a leader in environmental protection "conveyed an impression that was entirely false." *Id.* at 1200. Regarding the company's argument that the "total mix" of information was enough to counteract any misleading statements, the court called it a "close question" whether true environmental information available in the company's annual report was "buried" in a part of the report where shareholder "might not think to look." *Id.* The court ultimately decided that it need not resolve the question, because even the disclosures made in the report were insufficient to counteract the false impression given by the "pristine picture" in the proxy statement. *Id.*

Plaintiff's allegations that Defendants made material misstatements and omissions in the 2013 proxy statement pale in comparison to the misstatements in *United Paperworkers*, and are largely comparable to the types of statements held to be mere puffery. *United Paperworkers* involved a corporation with a truly atrocious and entirely undisclosed environmental history papering over its shortcomings with a glowing self-description of its past and representations of an unalloyed commitment to environmental protection. Aetna's representations in the 2013 Proxy Statement were not that it disclosed every contribution, direct or indirect, that it had made, nor that it was committed to disclosing information on its contributions to the extent that Plaintiff desires. Instead, the company stated its disclosures were "extensive," which is not the same as exhaustive. Moreover, Plaintiff does not appear to contest the vast majority of the factual statements the Company made in its proxy statement: that it "recently expanded the information available on its website about its policies and procedures regarding political contributions"; that it publishes the Political Contributions Report annually; that it makes available more information

24

than is required by law; that it was ranked fifteenth on the 2012 Zicklin Index (which, even

though Plaintiff alleges was undeserved, remains true); and that the 2012 IBEW resolution was

rejected by a large margin. *See* Dkt. No. 45-5 at 77-78 (2013 Proxy Statement).

Plaintiff's claims ultimately rest on two alleged misstatements. First, he alleges that

Defendants misleadingly "boasted ... that its political contributions are the model of

transparency," Am. Compl. ¶ 41, and second, that statements regarding the Board's or Audit

Committee's oversight of the Political Contributions Reports must have been untrue, because the

Reports themselves underdisclosed donations and otherwise contained errors, Am. Compl. ¶ 42.

The Defendants' alleged "boasting," however, is comprised of broad statements that could not

plausibly be expected to influence a shareholder's vote, and thus are nothing more than puffery.

The Proxy Statement explains that the issue is "important" to the company, that the Board has a

"robust" oversight role over the company's political contributions, and that the practices "meet

or exceed" shareholders' expectations. Dkt. No. 45-5 at 77-78. These sorts of statements are

similar to the ones found inadequate to state a claim in *Local 134*, 553 F.3d at 205-06, and do not

approach the level of misstatement and potential to mislead shareholders that plagued the proxy

statement in *United Paperworkers*.

Plaintiff's allegations concerning the statements about Board and Audit Committee

oversight of political contributions and the Contribution Report are also insufficient plausibly to

state a claim. Even accepting as true Plaintiff's allegations that the Political Contributions

Report do not disclose every aspect of Aetna's political spending, Plaintiff does not point to any

representation in the proxy statement that is actually misleading because of it. Indeed,

Defendants explain in the proxy statement that they do not believe additional disclosure is

warranted, so the fact that some contributions might go unreported could not have been lost on

shareholders before they cast their vote, even when Plaintiff's allegations are accepted as true. In light of this reality, Plaintiff's allegation that omissions from the Political Contributions Reports themselves were the result of inadequate oversight, and thus rendered the statements regarding Board and Audit Committee oversight in the proxy statement materially misleading, is nothing more than conjecture. It does not plausibly show a violation of Rule 14a that rises above the level of speculation.

Accordingly, Count II of the Amended Complaint must be dismissed.

## V.     Equitable Relief

Even if Plaintiff had otherwise stated adequate claims on Counts I and II, dismissal would be appropriate because Plaintiff has failed to adequately allege that he is entitled to the exclusively equitable relief he seeks. In the Amended Complaint, Plaintiff asks the Court to: 1) declare void the votes that defeated the Unitarian resolution in 2013; 2) require Defendants to inform shareholders that the 2013 Proxy Statement contained inaccurate and incomplete information in opposition to the Unitarian resolution and to inform shareholders of any judgment against defendants in this Court; 3) required Defendants to resubmit the Universalist resolution for a vote at the next shareholder meeting; 4) require Defendants to amend their Political Contributions Reports with "full and accurate information" for the years 2006-2012; and 5) appoint an individual within Aetna to be responsible for ensuring that future Political Contributions Reports are complete and accurate. Am. Compl. at 20-21.

In order to establish entitlement to a preliminary injunction, a plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) ("To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." (internal quotation marks omitted). Defendant argues that Plaintiff has failed to make allegations adequate to support any of these showings, and train particular focus on the requirement to show irreparable injury.

Plaintiff's argument that his allegations entitle him to permanent injunctive relief largely mirror his arguments at the preliminary injunction stage that the appropriateness of injunctive relief necessarily flows from success on the merits. He states that "public policy" requires injunctive relief because otherwise the statute would lack a remedy, that an injunction is necessary to redress repeated wrongdoing, and that "equity demands" an injunction. *See* Pl. Mem. in Opp. at 28-29 (Dkt. No. 46). At most, though, Plaintiff's arguments demonstrate that equitable relief is not wholly unavailable for a Rule 14a violation, which is uncontroversial, as it has indeed been used before. *See, e.g.*, *United Paperworkers*, 985 F.2d at 1197. That injunctive relief *may* be available does not alleviate the need for Plaintiff to state allegations that he is entitled to it on the facts of this case, however.

The Court agrees with Defendants that Plaintiff has not stated allegations, even if true, that would render a permanent injunction appropriate. Plaintiff's argument that an injunction is necessary to combat "systemic" or "continuing" wrongdoing is unsupported by any allegations of such systemic wrongdoing; this suit involves, at most, two allegedly misleading proxy statements, not a continuing pattern of false proxy statements. Forward-looking injunctive relief of this sort is not available absent plausible allegations that a plaintiff faces "a likelihood of

substantial and immediate irreparable injury" because of a real or immediate threat the plaintiff

will suffer an injury again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting

*O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).  While evidence of past injury may bear on the

likelihood of future injury, it does not establish it on its own. *See O'Shea*, 414 U.S. at 496.

Here, there are no allegations beyond the fact that Plaintiff was allegedly harmed in the past to

show anything about the likelihood of continuing violations, and thus Plaintiff's allegations of

future harm are too speculative to support injunctive relief.

 Otherwise, Plaintiff argues that he was harmed by deprivation of his right to "cast an

informed vote on shareholder proposals raising issues of important public policy."  Pl. Mem. in

Opp. at 29 (Dkt. No. 46).  However, Plaintiff does not raise any allegations showing why this

injury is irreparable absent a permanent injunction.  Indeed, Plaintiff's allegations may fall short

of demonstrating an injury at all; he does not allege that any shareholders might have voted

differently as a result of the disclosures, or that any different result might have obtained in the

voting on the shareholder proposals.  To the extent Plaintiff argues that a permanent injunction

would protect his right to "cast an informed vote," Pl. Mem. in Opp. at 29 (Dkt. No. 46), Plaintiff

does not demonstrate that such an injunction is necessary in light of the information that he now

possesses.

 Finally, insofar as Plaintiff seeks injunctive relief to correct both past and future errors in

the Political Contributions Reports, the Court finds that such an injunction would not redress the

wrongs Plaintiff has alleged.  Rule 14a concerns misstatements and omissions in *proxy*

*statements*, not in other documents prepared by a corporation that are merely referenced by a

proxy statement.  Thus, Plaintiff cannot demonstrate a right to an injunction to correct documents

other than the proxy statement (or a document incorporated by reference therein); the SEC's rule

simply does not reach such other publications.  Injunctive relief must be "narrowly tailored to fit specific legal violations." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994).  Any injunction requiring past or future corrections to Political Contributions Reports would not redress the legal violations alleged.

Accordingly, Plaintiff has failed to raise plausible allegations sufficient to demonstrate an entitlement to injunctive relief, which is the only type of relief he seeks.  Defendants' motion to dismiss must therefore be granted on these grounds as well.

## VI.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint under Rule 12(b)(6) is GRANTED.  The Clerk is requested to terminate the case.

This resolves Docket No. 43.


SO ORDERED.



Dated: March 26 , 2015
       New York, New York

_____
ALISON J. NATHAN
United States District Judge